**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

**RAY BLANCHARD,**

        **Plaintiff,**

**v.**                                      **Civil Action No. 2:14cv58
                                      (Judge Bailey)**

**UNITED STATES OF AMERICA,**

        **Defendant.**

### REPORT AND RECOMMENDATION

On July 25, 2014, the *pro se* plaintiff, an inmate then-incarcerated at USP McCreary in Pine Knot, Kentucky, initiated this case by filing a complaint pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §2671, *et seq.* The plaintiff was granted permission to proceed as a pauper on July 29, 2014, and paid his initial partial filing fee on October 15, 2014. On October 20, 1014, the undersigned directed the plaintiff to file a copy of his Administrative Tort Claim denial letter. The plaintiff filed what purports to be proof of having met the Exhaustion Requirement Under the Deeming Provision of the FTCA 28 U.S.C. & 2675(a) [sic] on November 4, 2014.[1] On November 24, 2014, the plaintiff filed a letter motion requesting that the court order the agency to forward a copy of a denial letter to plaintiff. On December 15, 2014, plaintiff filed a Motion Requesting the U.S. District Court to Hold the Federal Bureau of Prisons in Civil Contempt for Failure to Comport with the Prison Litigation Reform Act.

On February 10, 2015, the undersigned conducted a preliminary review of the file and determined that summary dismissal was not appropriate at that time. Thus, the Clerk was

---

[1] Attached to it, plaintiff provides copies of multiple letters of inquiry variously addressed to Deputy Regional Counsel; General Counsel for the Mid-Atlantic Regional Office; and the Regional Director for the Mid-Atlantic Regional Office, referencing having "filed several claims regarding legal deformities," noting that he had "forwarded a few Tort Claims" to their offices, and inquiring about four different Administrative Tort Claims he had pending. See Dkt.#s 22-1, 22-2, 22-3, 22-4, and 22-5.

directed to issue summonses and forward copies of the complaint to the United States Marshal Service for service of process.

On February 23, 2015, plaintiff filed certain documents "going into the <u>CREDIBILITY</u> of these officials[.]" On March 6, 2015, plaintiff filed documents titled "MISCELLANEOUS EXHIBIT (and several more to come)." On April 20, 2015, plaintiff moved for appointment of counsel. That same day, the government moved for an extension of time to respond. On April 28, 2015, plaintiff filed a Declaration for Entry of Default. By Order entered the same day, plaintiff's motion for appointed counsel was denied and defendant's motion for an extension was granted. On May 5, 2015, the plaintiff filed a document titled Plaintiffs [sic] Motion Objecting to Defendants [sic] Motion for Enlargement of Time and Motion to Hold Defendants in Civil Contempt for Failure to Comply with the Courts [sic] Order, which was docketed both as a response in opposition to the defendant's motion for an extension of time and a Motion to Hold Defendant in Civil Contempt for Failure to Comply with the Court's Order.

On May 13, 2015, the defendant filed a Motion to Dismiss or in the Alternative, Motion for Summary Judgment along with certain documents under seal. A <u>Roseboro</u> Notice issued on May 18, 2015.

On June 10, 2015, the plaintiff filed and Opposition to the Defendants [sic] Motion to Dismiss, or in the Alternative for Summary Judgment.

This case is before the undersigned for review, Report and Recommendation pursuant to LR PL P 2.

## I.  <u>Factual Background</u>

On November 14, 2008, after a three day jury trial in the District of Maryland, the plaintiff was convicted of being a felon in possession of a firearm.[2]  On June 23, 2009, he was sentenced to three hundred and twenty-seven months imprisonment with five years' supervised release.  He filed an unsuccessful direct appeal and then an unsuccessful motion to vacate under 28 U.S.C. §2255.  Subsequently, on November 25, 2014, pursuant to a motion under 28 U.S.C. §2241 filed in the sentencing court, his sentence was reduced to 120 months imprisonment with three years' supervised release.[3]

On June 6, 2013, plaintiff was designated to USP Hazelton at Bruceton Mills, West Virginia,[4]  where, on October 18, 2013, at approximately 2:29 PM, while housed in the Special Housing Unit ("SHU"), apparently in a dispute over having to accept a cellmate, plaintiff refused orders to submit to hand restraints as per BOP procedure to be moved to another cell.[5]  Accordingly, a calculated planned use of force team[6] was approved by the warden and assembled

---

[2] Information on plaintiff's underlying criminal case, D. Md. Case No. 8:07cr143, can be found on PACER.

[3] The BOP's online Inmate Locator indicates that plaintiff's projected release date is March 25, 2016.

[4] See BOP Inmate History for Ray Blanchard, Fed. Reg. No. 39642-037, dated April 15, 2015, Dkt.# 42-3 at 2.

[5] See Declaration of Jerald Riffle, ("Riffle Decl."), Dkt.# 42-5, ¶6 at 3, and Two-Hour Lieutenant Restraints Check Form, Dkt.# 42-7.

[6] BOP Program Statement P5566.06, Use of Force and Application of Restraints states in pertinent part:

> Calculated Use of Force and/or Application of Restraints. This occurs in situations where an inmate is in an area that can be isolated (e.g., a locked cell, a range) and where there is no immediate, direct threat to the inmate or others.  When there is time for the calculated use of force or application of restraints, staff must first determine if the situation can be resolved without resorting to force.
> (1) Calculated rather than immediate use of force is desirable in all instances corrections workers encounter.  . . . The safety of all persons is a major concern and Bureau of Prisons staff are required by laws, rules, and regulations, related to the Bureau of Prisons, to protect others from the hostile actions of others.  Immediate or unplanned use of force by staff is required when an inmate is trying to self-inflict injuries which may be life-threatening or is assaulting any other person . . . If the above circumstances are not present, staff should, if possible, employ the principles of calculated use of force.

Dkt.# 42-4 6.

to safely extract plaintiff.[7] Ultimately, a physical confrontation was avoided because plaintiff submitted to having the hand restraints applied.[8] The restraints were applied at approximately 3:00 p.m.;[9] plaintiff was then medically assessed,[10] extracted and moved into the other cell in the SHU without incident.[11] Because the plaintiff remained verbally abusive, profane, noncompliant, threatening and disruptive,[12] pursuant to BOP policy, ambulatory restraints were left on, double locked, with a black box attachment to secure them.[13]  At 8:30 a.m. on October 21, 2013, the SHU officer noted that plaintiff had calmed down slightly, agreed to accept a cellie and to comply with staff's orders; accordingly, the officer noted that the "desired calming effect" had been achieved; and removed plaintiff's leg irons.[14] Plaintiff's hand restraints were removed two hours later, at 10:30 a.m.; the Restraints Check Form notes plaintiff was finally "calm and complaint" and thus was moved to "cell 106."[15]

---

[7] Riffle Decl., Dkt.# 42-5, ¶6 at 3, and Form 583 Report of Incident, Dkt.# 42-6, §2 at 2.

[8] Riffle Decl. Dkt.# 42-5, ¶6 and Form 583 Report of Incident, Dkt.# 42-6, §6 at 3.

[9] Plaintiff contends they were applied at "approximately (beginning) 2:00 pm[.]" Dkt.# 1 at 9.

[10] During that medical assessment, although plaintiff did report neck pain, it was attributed to his long-standing neck injury from the MVA prior to prison.  He was examined by the nurse and reported no other injuries nor any pain in his back, wrists or right shoulder.  No medical care was required or given. See Hamilton-Rumer Decl., Dkt.# 42-8 at 2 – 3.

[11] Riffle Decl., Dkt.# 42-5, ¶6 at 3, and Form 583 Report of Incident, Dkt.# 42-6, §6 at 3.

[12] Two Hour Lieutenant Restraints Check Form, Dkt.# 42-7 at 1-9.

[13] "An inmate in ambulatory restraints has his hands cuffed in front, double locked, with a black box covering the center keyhole portion of the cuffs.  He also wears leg irons, with a security waist chain running through the black box on the handcuffs. The medical unit must advise security officers whether any medical reason prevents use of ambulatory restraints, and a nurse must examine the inmate to ensure that the restraints are appropriately applied and that two fingers can be placed under each cuff.  An inmate in ambulatory restraints can stand completely upright, move around his cell, use the bathroom, wash himself, and eat, but cannot lift his arms above his head, swing his arms, or kick his feet." Dkt.# 42-5 at 3.

[14] Dkt.# 42-7 at 9.

[15] See Two Hour Lieutenant Restraints Check Form, Dkt.# 42-7 at 1 and 9.

During the entire 67 ½ hours plaintiff's hands were restrained, he was checked every two hours by the SHU lieutenant, for a total of 31 times,[16] and his restraints were examined by medical personnel twice in each eight-hour shift, for a total of 14 times.[17] During each check by the SHU lieutenants, it was noted that plaintiff's restraints were appropriately applied and were not constricting blood flow to his hands or feet.[18] Throughout the time he was restrained, plaintiff never reported any injuries or complained of pain to the lieutenant during the welfare checks.[19] Further, the medical personnel checked the pulses in plaintiff's extremities every four hours, noting that his circulation was good; he had no complaints of pain, injury, or discomfort; and that he reported that he was able to feed and toilet himself without assistance.[20] On two occasions, the medical personnel noted that plaintiff's wrist restraints were loose enough that he had pushed them up to his mid-forearm.[21]

The plaintiff's BOP medical records indicate that he has an extensive history of numerous health issues, including a number of traumatic injuries, including bilateral hip fractures from a 1994 motorcycle accident repaired by open reduction and internal fixation ("ORIF").[22] Further, plaintiff complained of right shoulder pain as early as June 29, 2010;[23] a November 22, 2010, MRI of that shoulder revealed a partial tear of the supraspinatus muscle and/or tendon;

---

[16] Riffle Decl., Dkt.# 42-5, ¶10 at 4 - 5, and Two Hour Lieutenant Restraints Check Form, Dkt.# 42-7, 1 – 9.

[17] See Declaration of Jamie Hamilton-Rumer, RN ("Hamilton-Rumer Decl."), Dkt.# 42-8, ¶4 at 3, and Health Services Restraint Review Form, Dkt.# 42-9 at 1 – 5.

[18] Riffle Decl., Dkt.# 42-5, ¶10 at 4 - 5, and Two Hour Lieutenant Restraints Check Form, Dkt.# 42-7, 1 – 9.

[19] Riffle Decl., Dkt.# 42-5, ¶10 at 5, and Two Hour Lieutenant Restraints Check Form, Dkt.# 42-7, 1 – 9.

[20] Hamilton-Rumer Decl ., Dkt.# 42-8, ¶4 at 3, and Health Services Restraint Review Form, Dkt.# 42-9 at 1 – 5.

[21] Health Services Restraint Review Form, Dkt.# 42-9 at 1 – 2.

[22] Dkt.# 43-3 at 6.

[23] Dkt.# 43-3 at 9.

fluid in the subacromial and subdeltoid bursa; osteoarthritis; and acromioclavicular joint injury.[24] He also had an MRI of his left knee on the same date, which revealed a completely torn anterior cruciate ligament; an intact-but-buckled posterior cruciate ligament; chronic degenerative tear of the posterior horn of the medial meniscus; and a torn lateral meniscus.[25] Because his left knee was deemed to be the more urgent of the two problems, the right shoulder repair was deferred[26] in favor of a partial lateral meniscectomy and an ACL reconstruction of the left knee, performed on May 27, 2011.[27] With the right shoulder's treatment postponed, he experienced chronic dislocation of it with minimal use, affecting his activities of daily living; he did not improve with physical therapy and was discharged from it on October 20, 2010; activity modification did not help, nor did prolonged NSAID therapy.[28]

Plaintiff also complained of neck, wrist and forearm pain as early as February 18, 2011;[29] the neck pain was apparently related to a pre-prison motor vehicle accident;[30] however, an x-ray of the cervical spine was negative.[31] Both the neck and the wrist/forearm pain were reported "resolved" by September 16, 2011.[32] While the defendant contends that plaintiff "also previously claimed neck and wrist pain as the result of a separate use of force which occurred in December

---

[24] Dkt.# 43-3 at 9.

[25] Dkt.# 43-3 at 8.

[26] Dkt.# 43-1 at 20 – 26.

[27] Dkt.#43-3 at 8.

[28] Dkt.# 43-1 at 20 – 26.

[29] Dkt.# 43-3 at 6.

[30] Dkt.# 43-2 at 27-28.

[31] Dkt.# 43-3 at 6 and Dkt.# 43-3 at 8.

[32] Dkt.# 43-3 at 8.

2011,"[33] the undersigned finds no medical record supporting that contention within the record. On October 12, 2012, having failed conservative management of the right shoulder injury and with a provisional diagnosis of rotator cuff tear and/or rotator cuff tendinitis, plaintiff underwent a right shoulder arthroscopy,[34] and postoperatively, physical and occupational therapy.[35] He complained of an unspecified chronic backache on July 10, 2013.[36] He fractured the lateral tibial plateau of his right knee by jumping from his top bunk at Hazelton on December 31, 2013,[37] and underwent an ORIF on January 23, 2014 to repair it.[38] He spent months thereafter in a wheelchair,[39] then on crutches,[40] and then a cane,[41] and undergoing physical therapy.[42] He continued to have pain, effusion and tenderness in the right knee, and a subsequent orthopedic consultation recommended arthroscopic debridement for advanced degenerative joint disease and cartilage damage in its lateral compartment.[43]

A March 3, 2014 BOP summary of plaintiff's medical/surgical problems indicates that he also suffers from abdominal pain or colic; urinary difficulties related to benign prostatic hypertrophy; esophageal reflux, likely related to or exacerbated by his long-term NSAIDs use;

---

[33] Dkt.# 42, ¶21 at 9.

[34] Dkt.# 43-3 at 7.

[35] Dkt.# 43-1 at 20 – 26.

[36] Dkt.# 43-3 at 5.

[37] Dkt.# 43-2 at 13 – 14.

[38] Dkt.# 43-1 at 43.

[39] Dkt.# 43-4 at 22.

[40] Dkt# 43-4 at 37.

[41] Dkt.# 43-3 at 1.

[42] Dkt.#  43-1 at 35.

[43] Dkt.# 43-3 at 42 – 43 and Dkt.# 43-1 at 3.

benign essential hypertension; myopia in both eyes; and was first recommended for a rheumatology consult on March 30, 2011 for increased antinuclear antibodies[44] ("ANA") and a history of complaints of persistent polyarthritis and myalgia/myositis dating as early as October 26, 2010.[45] In March, 2014, plaintiff was recommended for a baseline EKG and an ultrasound of the gallbladder.[46]

The plaintiff's medical records also reveal some noncompliance with medical treatment as early as June 29, 2010.[47] Of note, on April 28, 2014, a member of the BOP nursing staff at USP McCreary noted that she met with "I/M Blanchard (young, black inmate in wheelchair) today. He has "self-diagnosed" with every ailment known to man. He said he read a medical science book. He has some consults pending[.]"[48]

## II.  The Pleadings

### A. The Complaint

The plaintiff asserts that the United States is liable under the FTCA for the malfeasance of its employees arising out of events that began at "on 10-18-2013 approximately (beginning) 2:00 p.m. through 10-22-2013 [at] 2:00 p.m.[,] when

1) he was subjected to "illegal torture tactics," "categorized under the INTENTIONAL TORTS SECTION as "ASSAULT AND BATTERY," when his ambulatory restraints were intentionally over-secured when there was no justifying physical threat of danger;[49]

---

[44]    An elevated ANA could indicate the presence of an autoimmune disorder. See: http://www.rheumatology.org/Practice/Clinical/Patients/Diseases_And_Conditions/Antinuclear_Antibodies_(ANA)/

[45] See Dkt.# 43-3 at 5. On July 21, 2014, plaintiff complained of having pain "all over," stated that he felt "terrible" and reported being concerned about having an autoimmune disorder. See Dkt.# 43-1 at 4-5.

[46] Dkt.# 43-1 at 20 – 26.

[47] Dkt.# 43-3 at 9.

[48] Dkt.# 43-1 at 17.

[49] Dkt.# 1 at 6.

2) "INTENTIONAL MEDICAL NEGLIGENCE/MALPRACTICE" was committed during restraint checks, when the medical personnel ignored his requests for medical treatment and assistance with the intentionally-over-secured restraints; and

3) other government employees were well aware of the illegal procedures that were taking place and failed to correct the illegality.

Plaintiff alleges that as a result of the United States' employees' intentional and wrongful actions, he sustained bilateral wrist injury, including nerve damage; lower back pain; injury to his neck; and a "torn right shoulder after shoulder surgery."

As relief, plaintiff requests that the court "arrange a settlement agreement regarding . . . [his] claims,[50] or set this matter for Trial [sic][.]"[51]

## B. The Defendant's Motion to Dismiss or in the Alternative, for Summary Judgment

The defendants contend that the complaint should be dismissed or summary judgment granted in its favor because

1) plaintiff's assault and battery and failure to remedy unauthorized procedure claims must be dismissed for lack of subject matter jurisdiction, pursuant to the FTCA discretionary function exception;

2) even if the discretionary function does not apply, summary judgment is appropriate as to plaintiff's assault and battery claim; and

3) plaintiff's medical negligence claim fails because he cannot establish the necessary elements of such a claim under West Virginia law.

## C. Plaintiff's Opposition to the Defendants [sic] Motion to Dismiss, or tin the Alternative, for Summary Judgment

In his 19-page response, plaintiff reiterates his claims, significantly elaborates upon them, appears to raise a new claim of conditions of confinement, and attempts to refute the government's arguments. He requests that the Court subpoena affidavits from his witnesses;

---

[50] Plaintiff's December 19, 2013 Administrative Tort Claim acknowledgement letter, attached to his complaint, states that plaintiff is claiming a "sum certain of $1,500,000 for his October 18, 2013 personal injuries." See Dkt.# 1-1; see also Dkt.# 1, §V at 4.

[51] Dkt.# 1 at 9.

strike the affidavits of the government's witnesses; and subpoena "ALL RECORDS NEEDED TO CORRORBORATE PLAINTIFFS [sic] CLAIMS PRESENTED[.]"

### III.   Standard of Review

**A. Motion to Dismiss**

Federal Rule of Civil Procedure 12(b)(6) provides for dismissal of a case when a complaint fails to state a claim upon which relief can be granted. Dismissal under Rule 12(b)(6) is inappropriate unless it appears beyond doubt that the plaintiff cannot prove any set of facts to support his or her allegations. Revene v. Charles County Comm'rs., 882 F.2d 870 (4th Cir. 1989). Courts, however, are not required to accept conclusory allegations couched as facts and nothing more when ruling on a motion to dismiss pursuant to 12(b)(6). A complaint must include "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do . . . ." Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007). "Factual allegations must be enough to raise a right to relief above the speculative level." Id.

To survive a motion to dismiss a plaintiff must state a plausible claim in his complaint that is based on cognizant legal authority and includes more than conclusory or speculative factual allegations. "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." Ashcroft v. Iqbal, 556 U.S. 662 (2009). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" because courts are not bound to accept as true a legal conclusion couched as a factual allegation. Id.; see also Nemet Chevrolet, Ltd. v. Comsumeraffairs.com, Inc., 591 F.3d 250 (4th Cir. 2009). "[D]etermining whether a complaint states a plausible claim is context-specific, requiring the reviewing court to draw on its experience and common sense." Id.

Whether a complaint is legally sufficient is measured by whether it meets the standards for a pleading stated in the Federal Rules of Civil Procedure. See Fed. R. Civ. P. 8 (providing general rules of pleading), Fed. R. Civ. P. 9 (providing rules for pleading special matters), Fed. R. Civ. P. 10 (specifying pleading form), Fed. R. Civ. P. 11 (requiring the signing of a pleading and stating its significance), and Fed. R. Civ. P. 12(b)(6) (requiring that a complaint state a claim upon which relief can be granted). See Francis v. Giacomelli, 588 F.3d 186 (4th Cir. 2009).

Plaintiff is proceeding *pro se* and therefore the Court is required to liberally construe his pleadings. Estelle v. Gamble, 429 U.S. 97, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976); Haines v. Kerner, 404 U.S. 519, 92 S. Ct. 594, 30 L. Ed. 2d 652 (1972) (per curiam); Loe v. Armistead, 582 F.2d 1291 (4th Cir. 1978); Gordon v. Leeke, 574 F.2d 1147 (4th Cir. 1978). While *pro se* pleadings are held to a less stringent standard than those drafted by attorneys, Haines, 404 U.S. at 520, even under this less stringent standard, a *pro se* complaint is still subject to dismissal. Id. at 520-21. The mandated liberal construction means only that if the Court can reasonably read the pleadings to state a valid claim on which the plaintiff could prevail, it should do so. Barnett v. Hargett, 174 F.3d 1128 (10th Cir. 1999). However, a court may not construct the plaintiff's legal arguments for her. Small v. Endicott, 998 F.2d 411 (7th Cir. 1993). Nor should a court "conjure up questions never squarely presented." Beaudett v. City of Hampton, 775 F.2d 1274 (4th Cir. 1985).

Ordinarily, a court may not consider any documents that are outside of the complaint, or not expressly incorporated therein, unless the motion is converted into one for summary judgment. Alternative Energy, Inc. v. St. Paul Fire and Marine Ins. Co., 267 F.3d 30 (1st Cir. 2001)(cited with approval in Witthohn v. Federal Ins. Co., 164 Fed. Appx. 395 (4th Cir. 2006) (unpublished)). There are, however, exceptions to the rule that a court may not consider any

documents outside of the complaint. Specifically, a court may consider official public records, "documents incorporated into the complaint by reference, and matters of which the court may take judicial notice," or sources "whose accuracy cannot reasonably be questioned." <u>Katyle v. Penn Nat'l Gaming, Inc</u>., 637 F.3d 462 (4th Cir. 2011).

## B. <u>Motion for Summary Judgment</u>

The Court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In applying the standard for summary judgment, the Court must review all the evidence "in the light most favorable to the nonmoving party." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986). The Court must avoid weighing the evidence or determining the truth and limit its inquiry solely to a determination of whether genuine issues of triable fact exist. <u>Anderson v. Liberty Lobby, Inc</u>., 477 U.S. 242, 248 (1986).

In <u>Celotex,</u> the Supreme Court held that the moving party bears the initial burden of informing the Court of the basis for the motion and of establishing the nonexistence of genuine issues of fact. <u>Celotex</u>, 477 U.S. at 323. Once "the moving party has carried its burden under Rule 56, the opponent must do more than simply show that there is some metaphysical doubt as to material facts." <u>Matsushita</u>, 475 U.S. at 586. The nonmoving party must present specific facts showing the existence of a genuine issue for trial. <u>Id</u>. This means that "the party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but must set forth specific facts showing that there is a genuine issue for trial." <u>Anderson</u>, 477 U.S. at 256. The "mere existence of a scintilla of evidence" favoring the nonmoving party will not prevent the entry of summary judgment. <u>Id</u>. at 248. Summary

judgment is proper only "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." <u>Matsushita</u>, 475 U.S. at 587.

## IV.  <u>Analysis</u>

### A. <u>Federal Tort Claims</u>

### 1)  <u>Intentional Acts</u>

Plaintiff alleges that BOP employees applied hand restraints that were "deliberately over-secured," constituting an assault and battery. Further, he contends that the BOP SHU staff was negligent, because they were aware that the "illegal procedure" was occurring but did nothing to "correct" the illegalities.

In his <u>Roseboro</u> response, for the first time, plaintiff alleges that after placing him in ambulatory restraints, the "Sort Team" escorted him down Range-1 backward, with his head pressed down toward the floor, causing "lower back injury," before placing him in a cell there. He alleges that he paced the floor of the cell for "20 Hours – or so"  in "serious pain" from the over-secured restraints that caused his "extremely swollen and deeply gashed" wrists, till he began to get lightheaded and pressed the "duress button" for help, then vomited and fainted. He alleges that the Hazelton officials and medical staff left him "laying face down in deep vomit" unattended for some unspecified amount of time, and that at some point after he "became partially conscious and screamed out for help to the Prisoners of Range-1," the other prisoners began "in SERIOUS PROTESTS PRESSING THE DURESS BUTTONS, KICKING DOORS (AND ETC.)."[52] He alleges that one Lt. Harris finally opened the door, saw him, and still failed to assist him or contact medical staff.  Plaintiff attaches copies of some of his grievances; a page

---

[52] Dkt.# 50 at 5 – 9.

of his medical record, and a partial copy of what appears to be another inmate's TRULINCS[53] email, containing "troubling new reports" about the BOP's "failing to care for their most vulnerable prisoners." Also attached to plaintiff's response, also with no explanation, is a document titled "This Correspondence is in regard to:" listing the President of the United States; Congress/Senate (Elijah Cummings/John Boehner); U.S. Supreme Court . . .The U.S. Justice Department Civil Section/Mrs. Lynch . . . U.S.A Today . . . The Washington Post . . . 60 Minutes (Executive Produce and Staff); MSNBC; Fammilies [sic] Against Mandatory Minimums (Mrs. Julie Stewart); Mim [sic] Prisons; Ebony and Jet Magazines; Mrs. Michelle Alexander (Civil Rights Attorney); Group-1-X; Group-2-X; Group-3-X; Premier Networks/America Now Radio (Producer Miranda); and "Whom it may concern."[54]

The United States enjoys sovereign immunity except to the extent that Congress has waived it by enacting the Federal Tort Claims Act, 28 U.S.C. §§2671, *et seq.* The FTCA provides at §2674 as follows:

> The United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances, but shall not be liable for interest prior to judgment or for punitive damages.

28 U.S.C. §1346(b)(1) and (2) provide as follows:

> (b)(1) [T]he district courts . . . shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages . . . for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

---

[53] Trust Fund Limited Inmate Communication System (TRULINCS) is the Federal Bureau of Prisons' electronic messaging system that enables inmates to send and receive electronic correspondence to persons in the community without having internet access.  See BOP Program Statement P5265.13.

[54] Dkt.# 50 at 18.

> (2) No person convicted of a felony who is incarcerated while awaiting sentencing or while serving a sentence may bring a civil action against the United States or any agency, officer, or employee of the Government for mental or emotional injury suffered while in custody without a prior showing of a physical injury.

Generally speaking, therefore, the FTCA confers subject matter jurisdiction to the District Courts over negligence actions against the United States. In order to maintain a case against the United States under the FTCA, the plaintiff must demonstrate that his action is permissible under the FTCA and satisfies the necessary elements of a tort claim cognizable under law of the state in which the action accrued. Under West Virginia law, which applies under the FTCA, the plaintiff in a negligence action bears the burden of proof by a preponderance of the evidence to demonstrate the applicable standard of care, deviation from that standard and a causal connection between the deviation and plaintiff's injury. See Judy v. Grant County Health Dep't., 210 W.Va. 286, 291 - 92, 557 S.E.2d 340, 345 - 46 (2001).

The waiver of the federal government's sovereign immunity through the FTCA with respect to negligence claims is not absolute. Congress specified a number of exceptions limiting the waiver in 28 U.S.C. §2680 including the discretionary function exception and the intentional tort exception, spelled out at subsections (a) and (h) of that statute as follows:

> The provisions of this chapter and section 1346(b) of this title shall not apply to –
> (a) Any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.
>
> * * *
>
> (h) Any claim arising out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights: *Provided*, That, with regard to acts or omissions of investigative or law enforcement officers of the United States Government, the provisions of this chapter and section 1346(b) of this title shall

apply to any claim arising, on or after the date of the enactment of this proviso, out of assault, battery, false imprisonment, false arrest, abuse of process, or malicious prosecution. For purposes of this subsection, 'investigative or law enforcement officers' means any officer of the United States who is empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal law.

If an exception set forth in 28 U.S.C. §2680 applies in an action, the United States has sovereign immunity, and the District Court has no subject matter jurisdiction. See Cohen v. United States, 151 F.3d 1338, 1340 (11th Cir. 1998).

A District Court considering whether the discretionary function exception bars an FTCA claim must determine whether: (1) the action taken involves choice by the acting government employee or a specific course was mandated by statute, regulation or policy; and (2) the choice is "of the kind that the discretionary function was designed to shield." Berkowitz v. United States, 486 U.S. 531, 536, 108 S.Ct. 1954, 1959, 100 L.Ed.2d 531 (1988). When established policy allows a government agent to exercise discretion, "it must be presumed that the agent's acts are grounded in policy when exercising that discretion." United States v. Gaubert, 499 U.S. 315, 324, 111 S.Ct. 1267, 1274, 113 L.Ed.2d 335 (1991). "'[I]t is the nature of the conduct rather than the status of the actor' that governs whether the exception applies." Gaubert, 499 U.S. at 323, quoting Viacao Aerea Rio Grandense (Varig Airlines), 467 U.S. 797, 813, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984).

Under the FTCA's intentional tort exception, the United States is not liable for the intentional torts of its employees unless committed by investigative law enforcement officers of the United States. Correctional officers qualify as "law enforcement officers" as defined in Section 2680(h). See Ortiz v. Pearson, 88 F.Supp.2d 151, 164 (S.D.N.Y. 2000). Accordingly, the FTCA waives sovereign immunity respecting their alleged intentional torts, but "the actions underlying intentional tort allegations described in §2680(h), if authorized and implemented

consistent with federal law and the Constitution of the United States, may be considered discretionary functions under §2680(a), even if they would otherwise constitute actionable torts under state law." <u>Medina v. United States</u>, 259 F.3d 220, 225 (4th Cir. 2001), *citing* Jackson v. United States, 77 F.Supp.2d 709, 714 (D. Md. 1999)("The Court holds that a FTCA plaintiff must first overcome the discretionary function 'hurdle' before the Court will consider intentional tort claims under §2680(h).")

Eighteen U.S.C. §4042(a)(3) provides that the BOP has the mandatory duty to "provide for the protection, instruction, and discipline of all persons charged with or convicted of offenses against the United States[.]" While this statute creates a mandatory duty, it is well-recognized that it does not set forth the manner in which the duty is to be fulfilled but leaves it to the discretion of the BOP. <u>See</u> <u>Carter v. United States</u>, 2002 WL 32332081, *5 (D.S.C.), 57 Fed.Appx. 208 (4th Cir. Mar. 14, 2003), citing numerous cases. The BOP has specified general principles applying to every disciplinary action taken in its regulations at 28 C.F.R. §541.10(b) as follows:

> (b) The following general principles apply in every disciplinary action taken:
> (1) Only institution staff may take disciplinary action.
> (2) Staff shall take disciplinary action at such times and to the degree necessary to regulate an inmate's behavior within Bureau rules and institution guidelines and to promote a safe and orderly institution environment.
> (3) Staff shall control inmate behavior in a completely impartial and consistent manner.
> (4) Disciplinary action shall not be capricious or retaliatory.
> (5) Staff may not impose or allow imposition of corporal punishment of any kind.

The undersigned finds that this regulation clearly allows considerable discretion to BOP staff in taking disciplinary action. Moreover, the use of ambulatory restraints was justified under the circumstances, to avoid immediate use of force with its potential for injury; thus, the BOP staff's was in compliance with Program Statement P5566.06.

Here, while the Hazelton SHU staff's action in keeping plaintiff in ambulatory restraints for 62 ½ hours might seem excessive, the undersigned finds that the SHU staff had the discretion to enforce institution regulations by addressing plaintiff's defiance of staff orders, as they did, in light of his prolonged belligerence toward them, and the discretionary function exception was designed to protect them against suit under the FTCA for doing so. Because the plaintiff cannot overcome the discretionary function hurdle, it is unnecessary to consider the intentional tort exception. It is further unnecessary to consider plaintiff's allegation that the Hazelton SHU staff subjected him to "illegal torture tactics," done purposefully to "TORTURE AND BREAK INMATES[,]"[55] or committed assault and battery by intentionally over-securing his restraints, let alone that he suffered any but the most *de minimis* injury[56] as a result. Nevertheless, the undersigned finds that there is no support in the record for the plaintiff's assertions. It is evident that the SHU staff did not abuse plaintiff in any way, despite his 62 ½ hour verbally abusive tirade against them for compelling him to move to another cell and accept a cellmate. The SHU staff deny, and plaintiff does not allege that they ever hit, struck, pushed, or otherwise assaulted or caused him harm;[57] he only alleges that that they over-secured his restraints, and forced him to walk backward down the range with his head pressed down, self-serving claims with no support in the record. It is apparent from the record that the Hazelton SHU staff did not make contact in any way with plaintiff other than to apply the restraints, and they did so in response to the plaintiff's violation of the Unit Rules, not with the intention of harming the plaintiff.

The plaintiff has not provided the Court with anything to refute the sworn Declaration of Lt. Jerald Riffle other than allegations that contradict the record produced by the defendants.

---

[55] Dkt.# 50 at 5.

[56] At the 1:00 p.m. check on October 19, 2013, plaintiff was noted to have a right wrist abrasion. Dkt.# 42-9 at 3.

[57] Riffle Decl., Dkt.# 42-5, ¶11 at 5.

Generally unsworn statements without more are not admissible on summary judgment to contradict sworn affidavits. Edens v. Kennedy, 112 Fed. Appx. 870, 877 (4th Cir. 2004) citing Scott v. Edinburg, 346 F.3d 752, 759 (7th Cir. 2003) and Provident Life & Accident Ins. Co. v. Goel, 274 F.3d 984, 1000 (5th Cir. 2001). Accordingly, balancing the plaintiff's bald assertions against the sworn declaration, the undersigned gives no credible weight to the same and is of the opinion that the plaintiff's claims have no merit.

For all of these reasons, the undersigned finds that the plaintiff's FTCA claims for assault and battery, and for the alleged failure by other BOP staff to intervene to correct the "illegality," must be dismissed.

## 2) Medical Negligence

To establish a medical negligence claim in West Virginia, the plaintiff must prove that: (a) the health care provider failed to exercise that degree of care, skill and learning required or expected of a reasonable, prudent health care provider in the profession or class to which the health care provider belongs acting in the same or similar circumstances; and (b) such failure was a proximate cause of the injury or death. W.Va. Code §55-7B-3. When a medical negligence claim involves an assessment of whether or not the plaintiff was properly diagnosed and treated, and/or whether the health care provider was the proximate cause of the plaintiff's injuries, expert testimony is required. Banfi v. American Hospital for Rehabilitation, 529 S.E.2d 600, 605-06 (2000).

Additionally, under West Virginia law, certain requirements must be met before a health care provider may be sued. W.Va. Code §55-7B-6. This section provides in pertinent part:

**§55-7B-6. Prerequisites for filing an action against a health care provider; procedures; sanctions**

(a) Notwithstanding any other provision of this code, no person may file a medical professional liability action against any health care provider without complying with the provisions of this section.

(b) *At least thirty days prior to the filing of a medical professional liability action against a health care provider, the claimant shall serve by certified mail, return receipt requested, a notice of claim* on each health care provider the claimant will join in litigation. The notice of claim shall include a statement of the theory or theories of liability upon which a cause of action may be based, and a list of all health care providers and health care facilities to whom notices of claim are being sent, *together with a screening certificate of merit*. The screening certificate of merit shall be executed under oath by a health care provider qualified as an expert under the West Virginia rules of evidence and shall state with particularity: (1) The expert's familiarity with the applicable standard of care in issue; (2) the expert's qualifications; (3) the expert's opinion as to how the applicable standard of care was breached; and (4) the expert's opinion as to how the breach of the applicable standard of care resulted in injury or death. A separate screening certificate of merit must be provided for each health care provider against whom a claim is asserted. The person signing the screening certificate of merit shall have no financial interest in the underlying claim, but may participate as an expert witness in any judicial proceeding. Nothing in this subsection may be construed to limit the application of rule 15 of the rules of civil procedure.

W.Va. Code §55-7B-6 (emphasis added).

This Court previously held that compliance with W.Va. Code §55-7B-6 is mandatory prior to filing suit in federal court. See Stanley v. United States, 321 F.Supp.2d 805, 806-807 (N.D. W.Va. 2004).[58]

Here, the plaintiff alleges that that USP Hazelton medical staff were negligent in their care of him, because they ignored his repeated requests for medical attention while he was in ambulatory restraints, despite his constant requests for medical treatment on "several occasions."

Setting aside for the moment that there is absolutely no support in the record for plaintiff's claims that the Hazelton staff ignored his requests for medical attention while he was restrained, let alone that he ever requested any medical attention while restrained, with regard to

---

[58] In Stanley, the plaintiff brought suit against the United States alleging that the United States, acting through its employee healthcare providers, was negligent and deviated from the "standards of medical care" causing him injury.

the appropriate standard of care, the plaintiff has completely failed to sustain his burden of proof. Plaintiff does not even assert, much less establish, the standard of care for the diagnosis or treatment of bilateral wrist injury, including nerve damage; lower back pain; neck injury; and a "torn right shoulder after shoulder surgery."[59] Under the circumstances of this case, plaintiff would be required to produce the medical opinion of a qualified health care provider in order to raise any genuine issue of material fact with respect to the defendant's breach of the duty of care. Further, a careful review of the copies of plaintiff's medical records, attached to the defendant's dispositive motion, reveals that the plaintiff has a long history of pre-existing injuries to each area of the body he now complains were injured in the October 2013 incident. Further, the records reveal that upon being examined by a health care provider immediately after the application of restraints on October 18, 2013, he denied any injury related to the planned forced move, or symptoms related to any injury when questioned.[60] It appears from the record that his first and only medical exam for any complaint of injury related to the October 18, 2013 incident was on December 18, 2013.[61] The record indicates that x-rays of his neck and back done at that

---

[59] Plaintiff offers no pleadings, affidavits, or declarations from any medical professional that establishes the applicable community standards for the diagnosis or treatment of these alleged injuries, and copies of plaintiff's medical records are insufficient to establish the standard of care.

[60] Dkt.# 43-2 at 27-28.

[61] The undersigned is aware that plaintiff filed a January 16, 2014 Request for Administrative Remedy, Informal Resolution Form, complaining of being denied medical treatment for his alleged October 18, 2013 injuries, but it is apparent from the staff response that if plaintiff did request sick call at all, he did not do so properly:

> I have been DENIED adequate medical treatment . . . I signed up several times to be evaluated by sick call for a incident which took place 10-18-13. I signed up specifically 11-1-13 and was IGNORED by PA-C Meyer. I was ONLY evaluated by submitting a sick call to AHSA Murdock, 12-17-13. There are several cases of negligence (SHU [sic] Relief requested: to be medically evaluated from [sic] my injuries sustained 10-18-13 (torn shoulder ___ [illegible] wrists damaged lower back – neck pain, damaged wrist nerves. I would like to respectfully request the second opinion of a doctor and I request a second opinion because when I was evaluated by PA-Myer I never once evaluated any complaints I asserted. Part C: Informal Resolution attempt. No relief granted. Comments. Sick call is completed in SHU by placing sick call complaint in door and will be picked up that morning by PA doing pill line and is triaged at that time. There must be a sick call slip present for sick call.

time showed only mild degenerative changes in the neck, and moderate degenerative changes in his back, attributed to his prior longstanding chronic neck, back, and right shoulder problems.[62] Further, a musculoskeletal exam of his wrist/hand/fingers at that visit was deemed normal with full range of motion.[63] He was prescribed Meloxicam, a nonsteroidal anti-inflammatory ("NSAID") and advised to follow up in the Chronic Care Clinic as needed.[64] Moreover, when he was seen repeatedly for subsequent exams for unrelated issues over the course of the next year+, he never mentions any issue with "bilateral wrist injury, including nerve damage;" rarely mentions lower back pain or neck pain/injury; and any mention of his right shoulder problem in the records is related to the right shoulder findings on his November 22, 2010 MRI. Moreover, when queried regarding pain throughout his many medical visits over the course of the following

---

Dkt.# 43-4 at 34.

Further, the record reveals that plaintiff attached a copy of an Inmate Request to Staff, purportedly dated "11-27-**2014,**" (emphasis added) to his December 15, 2014 motion requesting that the BOP be held in contempt, alleging that he had

> signed up for sick-call several times regarding having evaluation of my lower back, neck, R and L wrists, R shoulder and have had no success. I have completed a BP-9 where Mr. Holland (Warden) noted "You need to go through sick-call." I have contacted sick-call several time who stated <u>EACH TIME "THIS IS NOT A SICK-CALL ISSUE</u>." Further I made notice to Dr. Onuoha who told me I can be seen "<u>NEXT YEAR</u>" regarding these injuries. I am notifying that I would like to be seen by Health Care officials regarding the matters previously mentioned…

Dkt.# 23-7. However, the bottom half of the page allotted for "Disposition" by staff is completely blank, which raises the question of whether the request was ever submitted at all, especially given the fact that a copy of this Inmate Request does not appear in the records produced by the defendant with the other Inmate Requests to Staff that plaintiff filed. It further raises the possibility that plaintiff may have created it after the fact, to attempt to make it appear that he was requesting medical care as early as November 27, **2013**. Given that plaintiff's medical record contains no support for his claim that he repeatedly sought and was refused treatment for his alleged October 18, 2013 injuries before December 18, 2013 (the day after the BOP received his administrative tort claim) it appears plausible that this was an attempt to create a paper trail after the fact, as is the suspect date of "11-27-2014," since by that date, plaintiff would have been thirteen months out from the October 18, 2013 incident and would be unlikely to accidently write "2014," because at that point in time, he would be unlikely to make that type of error in date, two months before the new year began.

[62] Dkt.# 43-2 at 17-18.

[63] Dkt.# 43-2 at 17-18.

[64] Dkt.# 43-2 at 17 – 18.

year, his main complaint is pain related to his right knee fracture.[65] Finally, to the extent the plaintiff's medical negligence claims arise in West Virginia, there is nothing in the complaint which reveals that the plaintiff has met the requirements of W.Va. Code §55-7B-6. Thus, upon consideration that plaintiff's allegation involves complex medical ailments, the Court finds that a certificate of merit is required. Plaintiff has not obtained one and the time for doing so has long passed. Consequently, the United States' motion to dismiss or grant summary judgment in its favor should be granted.

**3) Conditions of Confinement Claims**

Plaintiff's reply to the <u>Roseboro</u> Notice appears to raise for the first time a conditions of confinement claim. He alleges that after being placed in ambulatory restraints, he was placed "in a cell on Range-1 WITH NO MATTRESS, BLANKETS, SHEETS, NO CLOTHING BESIDE THIN, PAPER SEE THROUGH BREAK AWAY GARMENTS." He contends that he had to "lay[] on a cold stell [sic] slab" despite the "conflict of interest involved regarding Cellmates and the SYMPTOMS ASSOCIATED WITH 'RHEUMATISM[,]'"[66] and that these "Treatments "nationally and internationally have been considered, to VIOLATE U.S. ETHICS CODES, CIVIL RIGHTS, THE U.S. CONSTITUTIONS [sic] CRUEL AND UNUSUAL PUNISHMENT CLAUSE AND HUMAN RIGHTS ARTICLE 5[.]"[67]

A conditions of confinement claim alleging a violation of the Eighth Amendment right to be free from cruel and unusual punishment is not actionable against the United States in a Federal Tort Claims Act (FTCA), 28 USC §2671 *et seq.* action. A constitutional tort is not cognizable under the FTCA. <u>Royster v. United States</u>, 2008 U.S. Dist. LEXIS 106634 *13

---

[65] Dkt.# 43-2 at 31 – 33.

[66] Dkt.# 50 at 8.

[67] Dkt.# 50 at 9.

(W.D. Pa. December 1, 2008). This claim, in addition to having no absolutely support in the record, must be dismissed for failure to state a claim upon which relief can be granted.

## V.   Recommendation

For the reasons set forth in this Order, it is recommended that the defendant's Motion to Dismiss or in the Alternative, for Summary Judgment (Dkt.# 41) be GRANTED and plaintiff's complaint be **DISMISSED as frivolous pursuant to 28 U.S.C. §1915A(b)(1) and 1915(e)(2)(B)(i) for the failure to state a claim upon which relief may be granted.**[68]

Further, the undersigned recommends that plaintiff's pending letter motion requesting that the court order the agency to forward a copy of a denial letter to plaintiff (Dkt.# 24); Motion Requesting the U.S. District Court to Hold the Federal Bureau of Prisons in Civil Contempt for Failure to Comport with the Prison Litigation Reform Act (Dkt.# 23); Motion/Declaration of Entry of Default (Dkt.# 35); and Motion to Hold Defendant in Civil Contempt for Failure to Comply with the Court's Order (Dkt.# 40) all  be **DENIED as moot.**

**Within fourteen (14) days** after being served with a copy of this Report and Recommendation, **or by June 30, 2015**, any party may file with the Clerk of Court written objections identifying those portions of the recommendation to which objection is made and the basis for such objections.  A copy of any objections should also be submitted to the United States District Judge.  **Failure to timely file objections to this recommendation will result in waiver of the right to appeal from a judgment of this Court based upon such recommendation**.   28 U.S.C. § 636(b)(1); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th

---

[68] The plaintiff is warned that that pursuant to 28 U.S.C. §1915(g) he will not be granted *in forma pauperis* status in the future, if he has "on 3 or more prior occasions, while incarcerated or detained in any facility, brought an action or appeal in a court of the United States that was dismissed on the grounds that it is frivolous, malicious, or fails to state a claim upon which relief may be granted, unless the prisoner is under imminent danger of serious physical injury."  The instant case will be the first filed by plaintiff in this district that has been recommended for dismissal as frivolous.

Cir. 1985); <u>United States v. Schronce</u>, 727 F.2d 91 (4th Cir. 1984), <u>cert. denied,</u> 467 U.S. 1208 (1984).

The Clerk is directed to send a copy of this Opinion/Report and Recommendation to the *pro se* plaintiff by certified mail, return receipt requested, to his last known address as shown on the docket.

DATED: June 16, 2015

_/s/_ James E. Seibert_____
JAMES E. SEIBERT
UNITED STATES MAGISTRATE JUDGE